Filed 3/13/23  In re K.C. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re K.C., a Person Coming Under the Juvenile Court Law. | |
| MARIN COUNTY HEALTH AND HUMAN SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>E.C.,<br><br>    Defendant and Appellant. | A165165<br><br>(Marin County<br>  Super. Ct. No. JV27035) |

This is the second time this dependency case is before us.  The original dispositional order removed an infant, K.C., from her parents' custody due to drug abuse by K.A. (mother) and the failure of E.C. (father) to protect the child.  We held the juvenile court had erred in removing the infant from father's custody and reversed the dispositional order with directions to conduct a new hearing based on current circumstances.  (*In re K.C.* (Nov. 18, 2021, A162399) [nonpub. opn.] (*K.C. I*).)

On remand, a supplemental petition was filed alleging that father also had an unresolved substance abuse problem.  The court sustained the supplemental petition, and it then entered a new dispositional order

1

continuing the child in out-of-home placement, ordering another round of reunification services and declining father's request to have his daughter returned to his custody.

Father again appeals. He raises challenges to the supplemental jurisdictional findings and the dispositional order, all premised on contentions that there is insufficient evidence he posed a risk to the child. He also raises issues concerning the relative placement preference and ICWA.

We reject his arguments and affirm in all respects.

## BACKGROUND

### A. Commencement of the Case and the Initial Disposition Order

We briefly summarize the facts leading up to the initial dispositional order which, except where indicated, are set forth more fully in our prior opinion. (*K.C. I.*)

K.C. was detained as an infant, at age three and a half months, when she was found alone with mother in a hotel room littered with drugs and drug paraphernalia, while mother appeared to be under the influence of either heroin or marijuana. Father was called to the scene, reported having gotten into a "disagreement" with mother in the hotel room the previous night, but denied knowing mother had been using drugs, and denied being romantically involved with her any longer. He said that after the fight with mother, he stayed overnight in the hotel room with the baby along with a "friend" with whom he cohabitated while mother slept outside in his truck. Mother was arrested and Marin County Health and Human Services (the Department) commenced these proceedings.

At the time of detention, father told the Department he himself had been clean since 2007, had "zero tolerance" for mother's drug use, and had

2

broken up with mother during her pregnancy with their daughter because of it.

In multiple reports prepared for the jurisdictional and dispositional hearing, the sole concern the Department expressed about father was his apparent difficulty prioritizing himself and the baby's needs over what appeared to be a co-dependent relationship with mother, including doubts as to whether he was truly unaware of mother's drug use. He otherwise appeared to be a kind, hard-working person who simply needed support services to help him separate from mother, prioritize the baby's safety and welfare over mother's needs and provide a stable home environment for the child.

It would later come to light, however, that father had supplied the Department with a false birthdate, which concealed a lengthy criminal record. Due to the incorrect birthdate, his criminal records check had come back clean. In reality, he had a history of arrests and convictions dating back 20 years, which the Department did not discover until long after the first dispositional hearing. Unbeknownst to the Department at the time of that first hearing, his record included three prior convictions on drug possession charges, including one (in 2013, a felony) that occurred five years after he claimed to have gotten clean and sober. The Department also was unaware of the fact that father was facing *pending* drug charges while the dependency case was underway (for possession and transport of a controlled substance), after an arrest that took place a week before K.C.'s birth and less than four months before the incident in the hotel room that led to her detention. Mother, then eight months pregnant, had been with father at the time; police found methamphetamine in their possession (which mother claimed belonged to her) and large amounts of cash in their car; and both had been arrested.

As noted, the Department knew none of this information at the time of the original jurisdiction/disposition hearing, which was held on February 25, 2021.

At that hearing, father continued to deny that he knew of mother's drug use, and mother absolved him of any involvement. She admitted the drug use allegations against her, testified father had nothing to do with her drug use and did not know about it, and testified she had been lying to him to cover it up because he has "tried to do everything right" and "would have been so against it."

At the conclusion of the first jurisdiction/disposition hearing, the court sustained the allegations of the petition and K.C. was declared a dependent under Welfare and Institutions Code section 300, subdivision (b).[1] The court ordered her removed from both parents' physical custody and ordered reunification services. Both parents then appealed the disposition order.

## B.     The Reunification Phase and Our Reversal

While the first appeal was pending, both parents received six months of reunification services. Father attended only 25 percent of the visits he was offered. After the first month of the reunification period, he stopped visiting in person with his daughter, and after two months stopped visiting altogether, with his last visit taking place (virtually) on April 29, 2021. Father also refused to drug test, which he had been ordered to undertake regularly as part of his case plan. He minimized mother's drug use, he failed to engage in co-dependency and parenting classes, and his contact with the Department was sporadic.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

4

Three months into the reunification period, moreover, and also unbeknownst to the Department at the time, father was arrested again on yet new drug charges (on May 25, 2021). Police stopped him for driving erratically, and he was found in possession of large amounts of methamphetamine in a backpack and drug paraphernalia, including in plain view on the car floor a burnt straw of the kind commonly associated with methamphetamine use. He was charged with felony possession of a controlled substance for sale, transport of a controlled substance and driving without a license. Police suspected he was dealing drugs but, according to the police report, father said he knew the backpack contained methamphetamine but denied intending to sell it and said he is only a user. He also told police (according to the police report) that he had been using a lot of methamphetamine lately because he is going through a CPS case. Due to the false birthdate father had given the Department, criminal records checks the Department performed during the reunification period did not reveal the new arrest either, and father did not inform the Department about it.

On September 20, 2021, both parents' reunification services were terminated at the six-month review hearing. A section 366.26 hearing was scheduled for January 11, 2022. Father was ordered to contact the Department to arrange for visits with his daughter pending the section 366.26 hearing, but he never did so.

About a month later, on November 18, 2021, we issued our opinion in the prior appeal. (*K.C. I.*) Based on the record then before us, we held the Department had not met its burden to prove by clear and convincing evidence that removal from father's custody was warranted, because there was no substantial evidence K.C. would not be safe from the dangers posed by

5

*mother's* drug use if father alone maintained physical custody of her.  In reaching that result, we explained that "the only evidence in the record that father posed any risk to his child was from the possibility of continued contact with mother; there is no evidence K.C. would be in any danger in his custody if the two parents lived apart, with no contact . . . ."  The record merely indicated that at most he was co-dependent, naïve and put his head in the sand about mother's drug use, we reasoned, which was not clear and convincing evidence K.C. would be in danger in his custody alone, subject to appropriate court supervision.

We reversed the initial disposition order and remanded the case for further proceedings "in light of current circumstances."  (*K.C. I.*)

## C.     The Subsequent Petition and Proceedings on Remand

Pending the issuance of our remittitur, the Department made multiple attempts to communicate with father to set up supervised visits after receiving our decision.  This ultimately led to the scheduling of a visit on December 27, 2021, which was virtual due to the foster family's holiday availability.  On the day of the visit, however, Father canceled it in frustration and insisted it be rescheduled, due to technical difficulties he encountered that he blamed on the Department for supplying him with the link only at the last minute, which was inaccurate.  On January 3, 2022, father finally visited with K.C. for the first time in eight months, but the (in-person) visit was ended early because the one-and-half-year-old child was crying and inconsolable in his presence.

Also, before our remittitur issued, the Department discovered that the birthdate father had supplied was false and ran a new criminal records check using correct information.  It then discovered his lengthy criminal record,

6

including the pending felony drug charges resulting from his May 25, 2021 arrest during the reunification period.[2]

On January 10, 2022, the day before the section 366.26 hearing had been originally scheduled to take place and while awaiting issuance of the remittitur, the Department filed a subsequent petition under section 342 alleging that father's unaddressed substance abuse (specifically, his extensive use of methamphetamine) placed K.C. at risk.[3] It based the petition on allegations of his felony arrest the prior May, as well as his failure to visit his daughter for the past eight months with no reasonable explanation.

In its new disposition/jurisdiction report, the Department reported on father's conversations with the social worker about the sustained allegations as well as the new ones. He admitted the arrest in May 2021, but denied any drug use, denied knowing there were any drugs in the backpack found in his car and said the backpack belonged to mother who was in a drug treatment program at the time and that he was planning to take it to her. The

---

[2] The record does not reflect how or precisely when the Department discovered this fact. The respondent's brief states that it was after we issued our opinion. Reports filed below indicate the Department had become aware of father's criminal background by early January 2022, which is when the Department spoke to father about it.

[3] A subsequent petition may be filed when there are "new facts or circumstances" sufficient to bring a dependent child under the court's dependency jurisdiction "other than those under which the original petition was sustained." (§ 342, subd. (a).) "Unless otherwise provided by law, all procedures and hearings required for an original petition are applicable to a subsequent petition" filed under section 342. (§ 342, subd. (b).) "Those procedures include holding detention, jurisdictional, and dispositional hearings in accordance with section 300." (*In re B.P.* (2020) 49 Cal.App.5th 886, 890.)

7

Department did not report any explanation by father for the drug paraphernalia found on the floor of his car at the time of his arrest (i.e., the burnt straw). Asked about the specific statements attributed to him in the police report, he denied having admitted methamphetamine use and said he had "no idea" how the police would have known about this case. He also denied having concealed the arrest from the Department and said he had told the social worker at the time that he was dealing with "legal issues." He also continued to assert that, on the day he left K.C. alone with mother at the motel, he did not suspect mother had been using drugs.

He said drug use was "not an issue" for him, denied using any drugs during the case, said he never drug tested during the reunification period only because of his work schedule, and was baffled it was even required. He acknowledged the Department had previously given him referrals to conveniently located drug testing lab sites and emphasized he was now willing to drug test.

As for missed visits, father told the social worker it had been hard to visit with K.C. during the reunification period because of his work schedule and distance (she was placed in Marin County, he lived in Vallejo), and that he didn't know he could visit with K.C. after his reunification services were terminated.

He complained that the entire case was a "headache" and involved many misunderstandings about what was expected of him.

By the time of the contested disposition/jurisdiction hearing held on March 9, 2022, father had visited with K.C. only one more time (virtually, on January 19, 2022), despite extensive documented efforts by the Department to facilitate regular, bi-weekly visits. During one two-week period, he cancelled two visits in a row because he said he was very sick, missed the

next three visits without contacting the Department, and when finally reached by the social worker also attributed the three missed visits to ill health. After that, he was largely non-responsive to the Department's outreach to him, and visits were frequently cancelled due to his failure to timely confirm them. Another time, he cancelled an upcoming visit due to "car issues."

Father had been asked to drug test, was given the necessary paperwork to do so and twice promised to do so the very day the Department addressed the subject with him, yet he never did.

The Department had visited his home and found he was living in a studio apartment with another person he described as a romantic partner, in a space that did not appear suitable to accommodate a toddler.

The Department recommended against returning K.C. to father's custody, principally citing concerns about his suspected drug use, refusal to drug test, sporadic contact with the Department over the course of the case and all the missed visitations.

At the contested hearing held on March 3, 2022, father asserted his Fifth Amendment privilege against self-incrimination, and the jurisdictional allegations of the subsequent petition were submitted on the basis of the Department's reports and sustained. The court found that father lacked credibility and "in fact [has] a very serious and longstanding substance abuse problem," evidenced in part by his pending arrest for drug possession and failure to visit with K.C. for so long. It noted that the newly discovered information about father's criminal background "clearly presents a very different picture of Father than . . . before" and also was evidence that father "is not going to be open and transparent" in handling the dependency case.

9

The court then turned to the disposition phase, at which the sole witness was the Department's social worker. She testified about father's failure to drug test and missed visits—including one visit scheduled for the very morning of the hearing, which was cancelled because father again failed timely to confirm it.

She also testified about concerns about the person with whom father appeared to be living, a person named J.M. who father introduced to the social worker as his romantic partner. J.M. told the social worker she was the person who had been present at the motel with father during the initial incident that led to K.C.'s detention, which raised questions as to whether J.M. had been abusing substances too, and upon further investigation the Department ascertained that J.M. has an extensive child welfare history herself. She has three adult children of her own who were in the dependency system due to neglect and substance abuse, and an 11-year-old child who was removed from her custody in March 2020 (i.e., about eight months before K.C. was detained) with whom she failed to reunify.

After hearing arguments, the juvenile court assessed the prospect of returning K.C. to father's custody based upon the current circumstances, as we ordered it to do, and declined to do so. It made extensive findings about father's lack of credibility on numerous subjects, his "dismal" visitation record, his violent criminal history, and co-habitation with someone with her own child welfare history and substance abuse history. "All of those factors indicate that it is not a safe situation for this Court to return [K.C.] to her father, and there is no identification of any person who could assist to make it safe [n]or a reasonable means to return her to her father's care." It ordered reunification services for both parents, and father then timely appealed the disposition order.

The juvenile court subsequently granted a section 388 petition by the Department to terminate both parents' reunification services early and scheduled a hearing under section 366.26, which we have temporarily stayed.

## DISCUSSION

## I.

## *Jurisdiction*

Father argues, first, that the subsequent petition failed to allege a legally adequate basis for dependency jurisdiction, for several reasons all premised on his contention that his conduct did not place K.C. at any current risk. He argues for the same reasons, in the alternative, that the jurisdictional findings were not supported by substantial evidence. We address the latter issue first, because " ' "[i]f the jurisdictional findings are supported by substantial evidence, the adequacy of the petition is irrelevant." ' " (*In re John M.* (2012) 212 Cal.App.4th 1117, 1123.)

The court adjudged K.C. a dependent under section 300, subdivision (b) which, as relevant here, authorizes the exercise of dependency jurisdiction if a child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness as a result of . . . [t]he inability of the parent . . . to provide regular care for the child due to the parent's . . . substance abuse." (§ 300, subd. (b)(1)(D).)

The court may exercise jurisdiction under this provision only if a child is at current risk at the time of the jurisdiction hearing. (*In re Carlos T.* (2009) 174 Cal.App.4th 795, 803.) Nevertheless, section 300 "does not require that a child actually be abused or neglected before the juvenile court can assume jurisdiction." (*In re I.J.* (2013) 56 Cal.4th 766, 773.) Jurisdiction "require[s] only a 'substantial risk' that the child will be abused or neglected." (*Ibid.*) " 'The court need not wait until a child is seriously abused or injured

11

to assume jurisdiction and take the steps necessary to protect the child.' " (*Ibid.*)

We review the court's jurisdictional findings for substantial evidence. (*In re I.J., supra,* 56 Cal.4th at p. 773.) Pursuant to that standard, we review the record in the light most favorable to the court's ruling, draw all reasonable inferences from the evidence to support the court's ruling, do not reweigh the evidence or exercise independent judgment, and ascertain only whether the record contains substantial evidence from which a reasonable trier of fact could find that the order is appropriate. (*Ibid.*) The appellant has the burden of demonstrating that there is no evidence of a sufficiently substantial nature to support the jurisdictional findings. (*In re Travis C.* (2017) 13 Cal.App.5th 1219, 1225.)

Father's arguments concerning jurisdiction are somewhat unfocused but, at bottom, all rest on a flawed assumption: that jurisdiction was premised solely on the fact of his May 2021 arrest for possession of drug paraphernalia and driving with a suspended license, about six months after K.C. had been placed in foster care and nearly a year before the second jurisdiction hearing took place. Relying principally on *In re J.N.* (2010) 181 Cal.App.4th 1010, which reversed a jurisdictional finding based on a single episode of drunk driving by parents who had no substance abuse issues, he argues there was no current risk of serious harm to K.C. from his behavior because there was evidence only of that single incident, the child was not in the car at the time of his arrest, was not physically harmed, and there was no evidence he had a substance abuse problem. Moreover, he asserts the charges against him were later dismissed.[4]

_____

[4] Father filed a motion asking us to take judicial notice of a September 16, 2022 order dismissing the felony drug charge against him that

12

The juvenile court's finding that father has a "a very serious and longstanding substance abuse problem" that placed K.C. at serious risk of harm is supported by substantial evidence. Contrary to father's arguments, that jurisdictional finding was not based solely on the fact that father was arrested in May 2021 for possession of methamphetamine.

To begin with, it was not the fact of his arrest but the circumstances of it that suggested drug use. Three months into the first reunification phase, a time when father should have been focusing on learning the importance of protecting K.C. from the dangers of (mother's) drug use, he was stopped by police for driving erratically, found in possession of a large quantity of methamphetamine and a burnt straw used for ingesting it and, according to the police report, admitted to police that he was using methamphetamine frequently because of this very case.

Although that incident took place about ten months before the jurisdictional hearing on the subsequent petition (held in March 2022), there is substantial evidence father had an ongoing drug use problem. By the time of that second hearing, not once in the past year had he drug tested, despite having been ordered to do so for six months as part of his original case plan

resulted from his May 25, 2021 arrest. We previously took the motion under submission, the Department opposes it, and we now deny it. Ordinarily, appellate courts are not permitted to "consider postjudgment evidence going to the merits of an appeal and introduced for the purposes of attacking the trial court's judgment" (*In re Josiah Z.* (2005) 36 Cal.4th 664, 676; see also *In re E.C.* (2022) 85 Cal.App.5th 123, 148-150), and father offers no reason for us to depart from this rule. Furthermore, the status of father's criminal case is irrelevant, because the minute order does not exonerate father of engaging in the underlying conduct for which he was arrested. It reflects only that the charge was dismissed at the request of the prosecutor who told the court "they might [be] refiling a new case."

and then having been asked repeatedly to do so again before the second jurisdictional hearing. "[C]ommon sense suggests a parent who consistently fails to appear for drug tests does so because of a consciousness of guilt." (*In re Noah G.* (2016) 247 Cal.App.4th 1292, 1304.) Furthermore, his visitation record had been dismal (as the juvenile court put it), which the juvenile court could reasonably infer was due to ongoing drug use, right up until the day of the second jurisdiction hearing when, yet again, he missed a scheduled visit with K.C. Unlike *J.N.*, which involved quite different facts, a reasonable factfinder could conclude that, at the time of the second jurisdiction hearing, father had a current substance abuse problem and had relapsed back into methamphetamine use at least as far back as the beginning of this case.

The juvenile court also did not err in finding father posed a serious risk to his child. It is irrelevant, as father contends, that he was arrested for possession of drugs and not use. Father cites no authority the court was required to base its determination of risk to K.C. on a charging decision by a prosecuting attorney. What matters are the facts, not the absence of a criminal conviction based upon them. A parent struggling with untreated drug addiction poses a safety risk to a child of tender years for practically a limitless number of reasons, and we do not understand father to contend otherwise. Here, father had already once endangered K.C. by minimizing the safety risk posed by *mother's* drug use (and even claiming, apparently falsely, that he was ignorant of it),[5] and by leaving the child alone with mother in a motel room when he knew or should have known she was actively using

---

[5] The court expressly ruled that it did not believe father's denials of knowledge of mother's drug use, particularly in light of the arrest shortly before K.C.'s birth in which both parents were found in possession of drugs.

14

drugs. And during the first reunification phase he continued to minimize her drug use. In these circumstances, the juvenile court could reasonably infer that he likewise would downplay the risk posed by his own methamphetamine use were K.C. returned to his custody. Indeed, unlike in *J.N.* cited by father, father minimized the seriousness of his conduct (denying he even has a drug problem) and resisted the Department's intervention, which too is evidence of current risk. (See *In re M.R.* (2018) 8 Cal.App.5th 101, 109-110 [distinguishing *J.N.*]; see also *In re A.F.* (2016) 3 Cal.App.5th 283, 291 [noting mother's denial of her substance abuse problem as evidence supporting jurisdictional findings].)

An inability to predict *precisely* how a parent might harm a child does not defeat jurisdiction. (*In re Travis C.*, *supra*, 13 Cal.App.5th at pp. 1226-1227.) It is sufficient if a parent's condition "create[s] a substantial risk of *some* physical harm or illness." (*Id.* at p. 1227.) That is true here. Father's arguments to the contrary ignore all of the substantial evidence that he had an ongoing problem with drug use at the time of the second jurisdictional hearing, which had previously evaded detection due his concealment of his criminal record and refusal to drug test for the Department.

Finally, to the extent father means his substance abuse poses no substantial risk to K.C. because she was already in foster care by the time it came to light, that is not the law. "[I]t is always the case with regard to a subsequent petition that the child at issue has already been declared a dependent child." (*In re Carlos T.*, *supra,* 174 Cal.App.4th at p. 806.) "[T]he fact that a child is currently protected from further abuse simply because the child already is under the jurisdiction of the juvenile court cannot preclude the court from finding, based upon new evidence . . . that the child remains at risk of abuse. The question to be asked in such a case is whether, in the

absence of the state's intervention, there is a substantial risk that the child will be abused" or neglected. (*Ibid*.) Otherwise, a subsequent petition would be pointless.

Here, although father had no immediate access to K.C. because she was in foster care, as we have just discussed, there was an ample evidentiary basis to infer that his drug use would endanger her if she were returned to his custody "without the state intervening to prevent him from obtaining access to [her]." (*In re Carlos T*., *supra,* 174 Cal.App.4th at p. 866.) Father cites no authority holding that a juvenile court lacks the power to sustain a subsequent petition based upon ongoing parental substance abuse that only comes to light after the child has been adjudged a dependent.

For these reasons, the subsequent jurisdictional findings were supported by substantial evidence. It is thus unnecessary to consider father's challenge to the legal sufficiency of the section 342 petition.[6]

## II.
### *Removal from Parental Custody*

Next, father challenges the second disposition order as unsupported by substantial evidence.

As we stated in our prior opinion, section 361 limits the juvenile court's authority to remove a child from a custodial parent's physical custody. (§ 361, subd. (c).) It states in relevant part: "A dependent child shall not be taken from the physical custody of his or her parents . . . with whom the child

---

[6] Father's failure to contest the adequacy of the subsequent petition in the juvenile court also forfeited his argument. (See *In re John M.*, *supra*, 212 Cal.App.4th at p. 1123 ["In general, a parent may not challenge the sufficiency of allegations in a dependency petition on appeal if he or she did not raise the issue in the dependency court"].)

resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence [that] . . . [¶] (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody."  (§ 361, subd. (c)(1).)

In asserting this standard was not met, father incorporates all his arguments concerning the jurisdictional findings, which we have rejected for the reasons just discussed.  All the evidence supporting the exercise of jurisdiction also supported continuing K.C. in out-of-home care.  Indeed, father's denial that he has a drug abuse problem in light of his history of drug arrests and charges, and coupled with his failure to drug test, provide a sufficient basis to uphold the finding.  (See, e.g., *In re A.F.*, *supra,* 3 Cal.App.5th at p. 293.)

There is also substantial evidence that there were no means short of removal that would ameliorate the danger to K.C.  The record reflects that father made little effort to address any of the safety concerns posed by *mother's* drug use, which reflects poorly on his general attitude toward parental drug use.  (Cf. *In re Cole C.* (2009) 174 Cal.App.4th 900, 918 [removal order held supported by evidence of father's failure to engage in voluntary services].)  Furthermore, the juvenile court could reasonably conclude that father could not be trusted to abide by court orders for family maintenance, including orders for regular drug testing as he now argues could have been utilized as a less drastic alternative.  The court could reasonably infer that he regards the Department's intervention as an injustice and a farce.  There is substantial evidence he supplied the

17

Department with a false birthdate to purposely obfuscate his criminal history. His criminal record, which included two probation violations, reflected he had twice violated court orders in the past. And, as discussed, he never once drug tested for the Department in all of a year, including during the period he was under court order to do so.

In sum, the removal order is supported by the required clear and convincing evidence there would be a substantial danger to K.C. if returned to father's custody.

## III.
### *Relative Placement Preference*

Next, father argues the juvenile court failed to properly apply the relative placement preference (§§ 309, 361.3). As father tacitly concedes in his reply brief, this issue was not raised below. We agree with the Department it has been forfeited. Reviewing courts ordinarily do not consider issues for the first time on appeal (*In re S.B.* (2004) 32 Cal.4th 1287, 1293), including the issue of relative placement (see *In re A.K.* (2017) 12 Cal.App.5th 492, 501 [relative placement issues held forfeited]). Given a child's interest in achieving permanence and stability, an appellate court's discretion to excuse a forfeiture should be exercised only rarely and "with special care" in dependency cases (*S.B.*, at p. 1293), and father offers no persuasive reason for us to do so here.

## IV.
### *ICWA*

Finally, father argues the juvenile court and the Department violated their duties of inquiry under ICWA. The Department concedes the error and assures us that it will conduct a proper inquiry while this appeal is pending and while proceedings are ongoing in the juvenile court.

18

In this circumstance, reversal is not warranted because the conceded error is not prejudicial. As recently explained by our colleagues in Division One: "[D]isturbing an early order in a dependency proceeding is not required where, as here, the court, counsel, and the Agency are aware of incomplete ICWA inquiry. The Agency must comply with its broad duty to complete all appropriate inquiries and apprise the court, and the court has a continuing duty to ensure that the Agency provides the missing information. So long as proceedings are ongoing and all parties recognize the *continuing* duty of ICWA inquiry, both the Agency and the juvenile court have an adequate opportunity to fulfill those statutory duties." (*In re S.H.* (2022) 82 Cal.App.5th 166, 179-180 [affirming dispositional order despite conceded ICWA error]; see also *D.S. v. Superior Court of San Bernardino County* (Feb. 15, 2023 [mod. Feb. 22, 2023], No. E079017) 2023 WL 2003338, at p. *2 ["ordinarily, the failure to comply with statutory duties under ICWA is not grounds for reversal of juvenile dependency orders issued prior to termination of parental rights"]; accord, *In re T.R.* (2023) 87 Cal.App.5th 1140, 1154; cf. *In re Baby Girl M.* (2022) 83 Cal.App.5th 635, 638-639 [reaching same result through mootness analysis].)

Father does not question that legal authority, attempt to distinguish it or argue the error here was nonetheless prejudicial. Accordingly, we will not reverse the dispositional error on this basis. If father has continuing concerns that the Department has not satisfied its inquiry obligations under ICWA as the case proceeds, then the proper vehicle to raise them will be in an appeal from an order terminating parental rights. (See, e.g., *In re E.C., supra,* 85 Cal.App.5th at p. 135 [conditionally reversing order terminating parental rights for prejudicial ICWA error].)

19

## DISPOSITION

The disposition order is affirmed. Our temporary stay of the hearing under section 366.26 is lifted.

_____
STEWART, P.J.

We concur.

_____
RICHMAN, J.

_____
MARKMAN, J.*

*In re K.C.* (A165165)

_____

    \* Judge of the Alameda Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.